**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SELENA Y. HANCOCK**, Plaintiff, v. **WASHINGTON HOSPITAL CENTER**, Defendant. | Civil Action No. 10-cv-487 (RLW) |

**MEMORANDUM OPINION**

Plaintiff Selena Hancock ("Hancock") suffers from Polyradiculopathy and Polyneuropathy, conditions impacting the nerve roots of her lower spine. She was formerly employed by Defendant Washington Hospital Center ("WHC" or the "Hospital") as a Medical Assistant, and she now brings this action alleging that WHC unlawfully failed to accommodate her disability and wrongfully terminated her employment in violation of the Americans with Disabilities Act (ADA). Specifically, Hancock pursues the following remaining claims against WHC: (1) Failure to Accommodate under the ADA (Count I); (2) Disability Discrimination in Violation of the ADA (Count II); (3) Intentional Infliction of Emotional Distress (Count IV).[1] This matter is presently before the Court on WHC's Motion for Summary Judgment. (Dkt. No. 20). For the reasons set forth below, the Court concludes that WHC's Motion must be **GRANTED in PART** and **DENIED in PART**.

[1] Originally, Hancock also advanced a claim for retaliatory discharge against WHC through Count III of her Complaint, but Hancock voluntarily dismissed that claim with prejudice on October 3, 2011. (Dkt. No. 16).

## BACKGROUND

The facts surrounding Hancock's claims are not terribly complicated, but they are disputed in some important respects. Selena Hancock was employed by Washington Hospital Center as a Medical Assistant from May 1999 until her termination, which either occurred on December 21, 2007, or June 10, 2008, depending on whose version of events is credited. (*Compare* Dkt. No. 20-3 ("Def.'s Stmt.") at ¶ 22, *with* Dkt. No. 22-1 ("Pl.'s Stmt.") at ¶ 29).[2]

As a Medical Assistant, Hancock's duties included registering patients, triaging patients, billing, patient referrals, assisting nurses, cleaning exam rooms, stocking and ordering supplies, answering telephones, and more. (Def.'s Stmt. at ¶ 2). As particularly relevant here, both parties agree that Hancock's triage responsibilities—which entailed preparing patients to be seen by a physician, escorting patients to the exam room, and taking and recording patients' information in their charts—were considered an essential aspect of her position. (*Id.* at ¶ 3).

---

[2] Notably, the Court previously warned WHC that the factual issues surrounding the timing of Hancock's termination appeared to be in serious dispute. (Dkt. No. 21 ("Pre-Motion Tr.") at 25-26) ("[W]hy isn't there going to be a dispute of fact that's going to preclude summary judgment, given the testimony from plaintiff that she was fired during this December 21st meeting?"). The Court specifically advised WHC's counsel:

> I would ask you to look long and hard and think long and hard before you file a motion on those grounds, because I've seen lots of instances where there's testimony from one party – from the plaintiff – and it may be countered by the testimony of 20 bishops on the other side, but buttom line is, under Rule 56, I don't know how it would be appropriate for me to completely discount the plaintiff's testimony.
>
> Now, if you've thought about this long and hard and you find some authority for that, that better be front and center in your brief. But otherwise, it seems to me that you're swimming upstream on that one, and that would be something that the jury has to decide . . . . So that one causes me some concern. I put you on notice; you can proceed how you feel appropriate.

(*Id.* at 25:23-26:12). Despite the Court's warning—and notwithstanding the existence of a clear dispute of material fact on this point—WHC chose to forge ahead.

In June 2006, Hancock began experiencing sharp pains in her stomach and was advised by her physician to go directly to the emergency room. (Pl.'s Stmt. at ¶ 1).[3] Following a sonogram, doctors discovered that Hancock had five fibroid cysts and four cysts in her rectum. (*Id.* at ¶ 2). Hancock underwent surgery to have those cysts removed, and she began to suffer from complications during her recovery. (*Id.* at ¶¶ 3-19). After several appointments over the course of a few weeks, Hancock's doctors determined that additional surgery was necessary and ultimately performed a total hysterectomy. (*Id.* at ¶¶ 20-21). During that procedure, Hancock's spine was apparently punctured, and she suffered nerve damage that left her disabled. (*Id.*). Hancock was diagnosed with Polyradiculopathy and Polyneuropathy, conditions that limit her ability to walk and lift. (*Id.* at ¶¶ 23-24). She also suffers from a permanent limp that precludes her from walking long distances and necessitates the use of a cane when walking. (*Id.*).

Following surgery, Hancock was discharged from her hospital stay in mid-August 2006, and she returned to work in late October 2006 with work restrictions that prohibited her from performing heavy lifting or manual labor for one month. (Def.'s Stmt. at ¶ 8). It appears WHC accommodated these restrictions, and Hancock does not argue otherwise. The record does not contain any information about Hancock's ability to work from November 2006 through the

---

3 The Court previously advised the parties that strict compliance with the Federal Rules and this Court's Local Rules, including Local Civil Rule 7(h), was required. (*See* Dkt. No. 19). Among other requirements, the Court's Order expressly advised that, if the non-moving party filed a "separate statement of genuine issues," pursuant to LCvR 7(h), the movant was expected to file "a separate document containing a concise and supported response to each of the respondent's facts, also in a numbered format that corresponds to the numbers in the respondent's statement." (*Id.*). The Court expressly cautioned that it "may deem each of the respondent's facts to be admitted unless controverted by the movant in its reply." (*Id.* at ¶ 8). Here, although Hancock filed a "Statement of Genuine Issues of Material Fact"—identifying 29 additional, separately-numbered facts that she contends preclude the entry of summary judgment in the Hospital's favor, (*see* Dkt. No. 22-1)—WHC failed to submit the requisite response called for by the Court's Order, nor did it otherwise controvert any of Hancock's additional facts. Thus, as forewarned, the Court will treat Hancock's additional facts as conceded for purposes of resolving the instant motion.

following October, but it seems that she was able to perform the essential functions of her job without issue. On October 15, 2007, however, Hancock was placed on "light duty" work restrictions for several weeks until November 7, 2007—specifically, "no lifting, bending," "no triage," and "no lifting over twenty pounds." (*Id.* at ¶ 13; Pl.'s Stmt. at ¶ 25). While WHC seems to have generally accommodated these restrictions, Hancock claims that she was forced to triage patients during this time period. (Pl.'s Stmt. at ¶ 25). Beginning on November 5, 2007, Hancock's only restriction was that she could not lift more than twenty pounds, and that restriction was effective until December 5, 2007. (*Id.* at ¶ 26). Thereafter, on November 21, 2007, Hancock was again restricted from performing triage duties for approximately four weeks, until December 24, 2007. (*Id.* at ¶ 27). Despite this, Hancock claims that she was again forced to continue triaging patients during this period. (*Id.*).

On December 20, 2007, Hancock apparently provided WHC with an updated occupational health form that placed her on "modified duty" and restricted her from performing triage duties for approximately two weeks, until January 2, 2008. (*Id.* at ¶ 28). After receiving that form, Hancock's supervisor, Shava Russell, indicated that WHC "could not accommodate [those] recommended restrictions" and signed her name on the report. (*Id.*). The next day, Ms. Russell sent Hancock an email stating, "Selena, Please clean out your locker, turn in your headset, badge, and locker key before leaving today." (*Id.* at ¶ 29). Shortly thereafter, Ms. Russell held a meeting with Hancock and Renee Nesmith, another WHC employee,[4] during which Hancock contends that she was terminated. (*Id.*). According to Hancock's testimony, Ms. Russell said that the Hospital would pay her long-term disability, and Hancock also testified that

[4] Neither party identifies Ms. Nesmith's title or role at WHC. Based on WHC's evidentiary submissions, it appears that Ms. Nesmith was another supervisor in the Medical Ambulatory Care Center unit where Hancock worked. (Dkt. No. 20-2 at Ex. 24 pp. 6-7). The Court thus presumes that Ms. Nesmith held some type of supervisory position over Hancock.

she was told, "You're going to need all the money you can get, so you need to work out through the rest of the day because you will no longer work here after today in this office." (Dkt. No. 22-4 at Ex. 2, Hancock Dep. at 86:9-88:16). Approximately one week later, on December 28, 2007, WHC received an additional "Occupational Helth [sic] Medical Referral" form, which described Hancock's restrictions as: "no pushing, no pulling, no lifting over 20 pounds, no triage . . . until further notice." (Dkt. No. 20-2 at Ex. 19).

WHC maintains that Hancock was not terminated in December 2007. Instead, the Hospital contends that Hancock was placed on a leave of absence on or about December 21, 2007, after WHC determined that it could not accommodate her triage restrictions. WHC also asserts that Ms. Russell consulted with her supervisor, Bradley Kappalman, prior to making that determination. (Def.'s Stmt. at ¶ 16). Based on the record, however, it was not until December 26, 2007—several days after determining that WHC declined to accommodate Hancock's "triage" restrictions—that Ms. Russell contacted Mr. Kappalman, stating, "I did not accommodate Selena's restricted duty AGAIN." (Dkt. No. 20-2 at Ex. 20) (emphasis in original). The following day, December 27, Mr. Kappalman responded, "Question. Why can we not accommodate her light duty? Don't we always need staff on the telephone?" (*Id.*). Ms. Russell responded, "If I only utilize her on the phones (long-term), then it sets me up to have to make likewise accommodations for other staff members in the future. What do you suggest?" (*Id.*). Thus, the evidence strongly suggests that Ms. Russell did not discuss Hancock's restrictions with Mr. Kappalman until several days <u>after</u> Ms. Russell had already determined that WHC would not accommodate Hancock's "triage" restrictions and <u>after</u> she had already

communicated that decision to Hancock.[5] Furthermore, in her December 26th email message, Mr. Russell basically admitted that she had already planned to have Hancock move on to a new position if she was not cleared to return to "full duty" by December 24, 2007, which was the expiration date of Hancock's prior medical restrictions. (*Id.*) ("I had explained to her [Hancock] previously that she needed to be cleared to return to work full duty by 12/24/07 or she would have to make other arrangements.").

Thereafter, WHC contends that Hancock submitted a claim for short-term disability benefits, as Hancock received a letter from Aetna on or around February 13, 2008, indicating that her claim was closed as of January 24, 2008, "based on lack of medical information." (Def.'s Stmt. at ¶ 18). Other than this letter, however, WHC did not present any other documentary evidence surrounding any potential disability benefits, such as a copy of the applicable disability insurance policy or the application form that Hancock ostensibly completed. On February 26, 2008, WHC sent Hancock a letter advising that her "leave of absence" was expiring on March 8, 2008, and that she "must either return to work by that date or submit additional information." (*Id.* at ¶ 19). The letter also advised that, if Hancock failed to do so, WHC would consider Hancock "to have abandoned [her] employment at the hospital." (*Id.*). Hancock did not respond to that letter. (*Id.* at ¶¶ 20-21). On June 10, 2008, WHC sent Hancock another letter explaining that her failure to return to work was being treated as "a voluntary termination with eligibility for rehire." (*Id.* at ¶ 22). The Hospital deemed June 10, 2008, to be the effective date of her termination. (*Id.*). Hancock does not dispute receiving these letters in early- to mid-2008, but

---

[5] In addition, Mr. Kappalman testified that he did not recall having any such discussion with Ms. Russell prior to their email communications beginning December 26, 2007. (Dkt. No. 22-6 at Ex. 10, Kappalman Dep. at 19:2-6).

she explains that she did not believe she had any obligation to respond because, in her mind, she had already been terminated by WHC in December 2007.

## **ANALYSIS**

### A. Standard of Review

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). To establish a genuine issue of material fact, the nonmoving party must demonstrate—through affidavits or other competent evidence, FED. R. CIV. P. 56(c)(1)—that the quantum of evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). While the Court views all facts in the light most favorable to the nonmoving party in reaching that determination, *Keyes v. District of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004), the nonmoving party must nevertheless provide more than "a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. But "[i]f material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Kuo-Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

### B. Failure to Accommodate (Count I)

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). As relevant here, "'discriminate' is defined to include 'not making reasonable accommodations to the known physical or mental

limitations of an otherwise qualified individual with a disability . . . , unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business.'" *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A)). The term "qualified individual" under the ADA means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id*. § 12111(8). To establish a *prima facie* case of discrimination for failure to accommodate under the ADA, a plaintiff must show: "(1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Gordon v. District of Columbia*, 480 F. Supp. 2d 112, 116 (citing *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002)); *Woodruff*, 482 F.3d at 527 (finding *prima facie* case satisfied where plaintiff alleged that he was "a qualified individual with a disability" and that his employer "failed to grant him the reasonable accommodations his disability necessitated") (internal quotations omitted).

WHC argues that Hancock's reasonable accommodation claim fails because she cannot establish the third element above—that she was able to perform the essential functions of her Medical Assistant position. Specifically, WHC claims that, because Hancock was unable to perform triage duties "until further notice," she was asking WHC to permanently eliminate an essential function of her job on December 21, 2007. (*See* Dkt. No. 20-1 ("Def.'s Mem.") at 10-12; Dkt. No. 23 ("Def.'s Reply") at 6). According to WHC, this precludes Hancock from establishing that she was a "qualified individual" under the ADA. Hancock disputes this assertion and responds that she was <u>not</u> permanently restricted from triaging patients as of

December 21, 2007. (Dkt. No. 22 ("Pl.'s Opp'n") at 13-15). Based on the record evidence, not only is Hancock correct that this fact is disputed, but WHC's arguments border on the blatantly false.

On December 21, 2007—when WHC refused to accommodate Hancock's restrictions—the occupational health form that Ms. Russell reviewed simply indicated that Hancock was unable to perform triage work for approximately two weeks, through January 2, 2008. (Pl.'s Stmt. at ¶ 28). It was not until December 28, 2007—an entire week after WHC had already denied Hancock's request—that WHC received the occupational health form that indicated Hancock's triage restriction was in place "until further notice," and even then, the form was received not by Ms. Russell, but by Marilyn Cox, the Clinical Manager of WHC's Occupational Health Department. (Dkt. No. 20-2 at Ex. 19). WHC expressly concedes as much in its reply briefing. (Def.'s Reply at 8). Moreover, the evidence strongly suggests that Ms. Russell had already made up her mind not to grant Hancock any further accommodations before she even received Hancock's form on December 21st. (Dkt. No. 20-2 at Ex. 20). In her December 26th email message to Mr. Kappalman, Mr. Russell relayed that she "had explained to [Hancock] previously that she needed to be cleared to return to work full duty by 12/24/07 or she would have to make other arrangements." (*Id.*). So it seems that Ms. Russell did not care whether Hancock's restrictions were temporary or permanent—apparently any further request for an accommodation, no matter the nature or duration, would have been denied. At a minimum, there is a clear factual dispute as to whether, at the time Mr. Russell determined that WHC could not accommodate Hancock on December 21, 2007, Hancock was seeking a <u>temporary</u> accommodation excusing her from triage work, and not a <u>permanent</u> accommodation.

While it is true that the ADA "does not require an employer to 'reallocate job duties in order to change the essential functions of a job,'" *Terrazas v. Medlantic Healthcare Group, Inc.*, 45 F. Supp. 2d 46, 53 (D.D.C. 1999), Hancock was not, as of December 21, 2007, seeking the type of permanent restriction that WHC misleadingly argues. *Cf. Jones v. District of Columbia*, 505 F. Supp. 2d 78, 90-91 (D.D.C. 2007) (rejecting employee's request for permanent light-duty status as unreasonable accommodation); *Duncan v. Harvey*, 479 F. Supp. 2d 125, 132 (D.D.C. 2007) (finding employee's request to permanently remove job duty from position was unreasonable under the ADA). Furthermore, as explained in the EEOC enforcement guidance, "[a]n employer never has to reallocate essential functions as a reasonable accommodation, <u>but can do so if it wishes.</u>" EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (Oct. 17, 2002), *available at* http://www.eeoc.gov/policy/docs/accommodation.html (emphasis added).[6] Here, WHC itself admits that temporarily reassigning Hancock's triage duties to other employees for a <u>limited</u> period of time—essentially the accommodation Hancock sought—may have been reasonable. (Def.'s Mem. at 10 ("[T]riage is a function that can be handled by other professionals such as physicians <u>on a temporary basis</u> . . . .")) (emphasis added). Moreover, the record shows that WHC had, in fact, temporarily excused Hancock from performing triage work in the recent past—both in October 2007 and again in late November 2007. (Pl.'s Stmt. ¶¶ 25-26). As a result, material disputes of fact exist as to whether WHC improperly failed to accommodate Hancock's disability.

---

[6] While the Court observes that EEOC guidance "does not carry the force of law and is not entitled to any special deference," *Desmond v. Mukasey*, 530 F.3d 944, 957 (D.C. Cir. 2008), our Circuit has explained that EEOC Guidelines "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998) (en banc) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986)).

Finally, to the extent that WHC argues that it was unable to accommodate Hancock's triage restriction because it would impose an undue hardship on the Hospital, the competing evidence in the record raises a dispute on this point. Specifically, when Ms. Russell notified Mr. Kappalman that she refused to accommodation Hancock's restrictions, he asked, "Why can we not accommodate her light duty? Don't we always need staff on the telephone?" (Dkt. No. 20-2 at Ex. 20). Ms. Russell responded, "If I only utilize her on the phones (long-term), then it sets me up to have to make likewise accommodations for other staff members in the future." (*Id.*). Confronted with this evidence, a reasonable jury could conclude that WHC was not concerned about the undue hardship that Hancock's specific restrictions might impose, but rather about the precedent that granting Hancock's restrictions might set for future employees.[7] Further, as set forth above, these same email messages suggest that Ms. Russell had already made up her mind that she would no longer accommodate Hancock, regardless of the nature and extent of Hancock's requested restrictions. Given these material disputes of fact, the Court concludes that summary judgment is inappropriate as to Hancock's reasonable accommodation claim.

[7] In her opposition briefing, Hancock urges the Court to find that WHC has waived its ability to argue "undue hardship" because it did not assert such an affirmative defense in its answer. The Court declines Hancock's invitation at this time. While the D.C. Circuit has held that a party must generally raise its affirmative defenses before it can rely upon them in a dispositive motion or at trial, *see Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 345 (D.C. Cir. 1997), parties can also sometimes assert affirmative defenses as late as the summary judgment stage and beyond. *See Daingerfield Island Protective Soc'y v. Babbitt*, 40 F.3d 442, 445 (D.C. Cir. 1994); *see also Long v. Howard Univ.*, 512 F. Supp. 2d 1, 12-13 & n.7 (D.D.C. 2007); *Raney v. District of Columbia*, 892 F. Supp. 283, 285 (D.D.C. 1995). To the extent that WHC intends to claim undue hardship in defending against Hancock's claims at trial, however, the parties should meet and confer in good faith in an effort to satisfactorily resolve this issue without the Court's further intervention. If the parties cannot resolve the matter informally, both sides should be prepared to discuss their respective positions, with appropriate authority, at the upcoming January hearing.

**C. Disability Discrimination (Count II)**

Along with her failure to accommodate claim, Hancock also asserts that the Hospital discriminated against her on account of her disability when she was terminated from WHC. This type of disability discrimination claim under the ADA is subject to the familiar three-part burden-shift test announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, the plaintiff must establish a *prima facie* case of discrimination under the ADA by showing that she: "(1) had a disability; (2) was qualified for the position with or without a reasonable accommodation; and (3) suffered an adverse employment action because of the disability." *Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929, 933-34 (D.C. Cir. 1999). If the plaintiff does so, the burden shifts back to the employer to articulate a "legitimate non-discriminatory reason for its action," leaving the plaintiff an opportunity to prove that the employer's proffered justification was not the true reason, but a pretext for discrimination. *Id.* (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).

In determining whether Hancock's termination-based disability claim should survive summary judgment, the Court must first address a significant, threshold factual dispute between the parties—precisely when Hancock's employment was actually terminated. On the one hand, Hancock contends that she was terminated on December 21, 2007, immediately after she presented her supervisors with updated medical restrictions, including her triage limitations. (Pl.'s Opp'n at 21-26). WHC, on the other hand, maintains that Hancock was simply placed on a leave of absence on December 21, 2007, insisting that it was not until June 10, 2008—after Hancock failed to submit updated medical documentation regarding that supposed leave of absence—that her employment was ultimately terminated. (Def.'s Mem. at 12-16). In seeking summary judgment, WHC urges the Court to reject Hancock's version of events as speculative

and "fully at odds with the facts." (Def.'s Reply at 2). It is true that speculation and conjecture are insufficient to avoid summary judgment, *see, e.g.*, *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993), but these are not appropriate labels for the evidence Hancock identifies here. Rather, Hancock relies on a December 21st email message from Ms. Russell directing Hancock to "clean out [her] locker, [and] turn in [her] headset, badge, and locker key before leaving . . . ." (Pl.'s Stmt. at ¶ 29). Hancock also testified that, after Ms. Russell and Ms. Nesmith instructed her to file for long-term disability, she was expressly told that she would "no longer work here after today [December 21st] in this office." (*Id.*). From these facts, a jury could reasonably conclude that Hancock was terminated on December 21, 2007.

WHC also responds that, when these facts are viewed in context and alongside Hancock's apparent application for disability benefits, no reasonable jury could possibly conclude that Hancock was terminated in December 2007. (Def.'s Reply at 13-14). But WHC's evidence on this point is superficial, at best. First, while WHC implies that only current WHC employees are eligible to receive disability benefits under its plan, there is no evidence of this in the record, and the Court will not make this leap on WHC's behalf. Even if the Court were to find that Hancock applied for and/or received disability benefits, as WHC argues, this does not mean that she was necessarily a WHC employee at the time. *See, e.g.*, *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440 (6th Cir. 2009); *Bard v. Boston Shipping Ass'n*, 471 F.3d 229 (1st Cir. 2006). Second, WHC asserts that Hancock "appl[ied] for medical leave on December 28, 2007," (Def.'s Mem. at 7), but this assertion did not appear in WHC's statement of undisputed facts and was not supported by any evidence. At a minimum, the Court would expect to have received a copy of the leave of absence form that Hancock supposedly completed and signed, but WHC

provided no such documentation. In short, WHC's flimsy evidentiary proffer falls far short of the requisite showing of undisputed facts necessary for summary judgment.

From there, upon crediting Hancock's assertion that she was terminated on December 21, 2007—as the Court must at this stage, *see, e.g.*, *Steele*, 535 F.3d at 692—the Court finds that Hancock has also raised a triable issue of fact as to whether WHC's decision was discriminatory. Under Hancock's theory, just one day after providing her supervisors with updated work restrictions, WHC refused to accommodate those restrictions and discharged her employment with the Hospital. Moreover, Hancock testified that, in communicating that decision during a meeting on December 21st, her supervisors stated:

> You're going to need all the money you can get, so you need to work out through the rest of the day because you will no longer work here after today in this office . . . . If you leave now, we're going to say that you abandoned your job. So you need to go fill out those papers because you are disabled, you have a limp . . . .

(Dkt. No. 22-4 at Ex. 2, Hancock Dep. at 88:7-14). Faced with this evidence, a jury could reasonably conclude that Hancock was discriminatorily terminated in December 2007 due to her disability. WHC presents no argument to the contrary. Instead, the Hospital devotes the bulk of its briefing on this issue to explaining how its termination of Hancock's employment <u>in June 2008</u> was based on legitimate, non-discriminatory reasons—namely, her failure to properly respond to WHC's requests for additional medical information regarding her ability to return to work. (*See* Def.'s Mem. at 12-16; Def.'s Reply at 11-14). But those contentions are altogether immaterial to WHC's actions in December 2007. To the extent that a jury ultimately credits WHC's timeline over Hancock's, WHC's arguments might well carry the day. At the summary judgment stage, however, WHC has failed to establish that it is entitled to judgment as a matter

of law under Hancock's version of events.[8] Because disputed issues of material fact surround Hancock's disability discrimination claim, the Court denies WHC's motion as to Count II.

**D. Intentional Infliction of Emotional Distress (Count IV)**

To prevail on a claim of intentional infliction of emotional distress under District of Columbia law, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 255 (D.C. Cir. 2008) (quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002)). With respect to the first element, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045-46 (D.C. 2007). By contrast, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not surpass the high threshold of sufficiently "outrageous" conduct. *Browning v. Clinton*, 292 F.3d 235, 248 (D.C. Cir. 2002) (quoting *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)). Moreover, "employer-employee conflicts" generally do not rise to the level of outrageous conduct necessary to sustain a viable IIED claim. *Kassem*, 513 F.3d at 255 (citing *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 211-12 (D.C. 1997)); *Kerrigan v. Britches of*

---

8 In addition, the Court notes that WHC devoted several pages of its brief (and a number of lengthy exhibits) to arguing that Hancock's employment "was marked with disciplinary measures." (Def.'s Mem. at 4-5; Def.'s Stmt. at ¶ 4). The inclusion of these assertions is somewhat baffling to the Court, given that WHC does not contend that Hancock's employment was terminated for disciplinary reasons or some other type of poor performance. Rather, WHC maintains that Hancock was terminated because she failed to return from a leave of absence and was deemed to have abandoned her job. As best the Court can surmise, these assertions were only included as an attempt to smear and/or discredit Hancock. Regardless of WHC's motives, however, the Court does not afford these extraneous allegations any significance.

*Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997) ("In the employment context, we traditionally have been demanding in the proof required to support an intentional infliction of emotional distress claim.").

In this case, Hancock's IIED claim is premised entirely on WHC's termination of her employment and its alleged failure to accommodate her triage-based restrictions in December 2007, as outlined above. She argues that those actions, coupled with Ms. Russell's and/or Ms. Nesmith's alleged remarks that (1) "[she] will no longer work [t]here after today" and (2) asking whether she would rather "sue the hospital" or "keep [her] job," are sufficient to maintain her IIED claim. (Pl.'s Opp'n at 26-28). The Court disagrees. To begin with, Hancock herself rightly recognizes that these kinds of "employer-employee disputes" generally cannot suffice as "outrageous" conduct—in fact, she expressly concedes that "the mere discharge of an employee is not considered extreme and outrageous conduct." (*Id.* at 27). In addition, the D.C. Court of Appeals has rejected IIED claims asserting purportedly "outrageous" conduct in excess of what Hancock alleges here. *See, e.g.*, *Kerrigan*, 705 A.2d at 628 (finding allegations that plaintiff's supervisor "targeted him for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him," were insufficient to establish outrageousness); *Paul v. Howard Univ.*, 754 A.2d 297, 307 (D.C. 2000) (finding allegations that plaintiff's employer "wrongfully denied her tenure, reassigned her students and grants, requested that she vacate her office . . . , and otherwise discriminated against her" to be inadequate).

Despite all this, Hancock insists that her IIED claim is viable because "she became disabled as the result of the surgeries she underwent at the hands of Defendant's employees." (Pl.'s Opp'n at 28). In so arguing, Hancock cites to *Drejza v. Vaccaro* and assert that the

"outrageous" nature of WHC's arises from its "knowledge that [she was] peculiarly susceptible to emotional distress." *Drejza*, 650 A.2d 1308, 1313 (D.C. 1994). According to Hancock, because WHC was the cause of her disability—*vis-à-vis* the surgeries performed at the Hospital—WHC's subsequent refusal to accommodate that disability and discharge of her employment elevated what might otherwise be non-actionable conduct to a sufficiently outrageous level to sustain her claim. The Court finds this novel argument unpersuasive. To be sure, this case is a far cry from the facts in *Drejza*, wherein the D.C. Court of Appeals found that a police officer's allegedly derisive behavior toward a violent rape victim—within one hour after the crime was committed—created a jury question as to whether the officer's conduct was sufficiently "outrageous." *Id.* at 1315-17. By contrast, at the time Hancock claims that WHC failed to accommodate and wrongfully terminated her, she had already been living with her disability for more than an entire year and there is no evidence in the record to suggest that she was particularly vulnerable or emotionally sensitive in December 2007. In short, no reasonable jury could conclude that WHC's employment-based actions were sufficiently extreme or outrageous to sustain Hancock's IIED claim. Accordingly, the Court will grant WHC summary judgment on this claim.

**E. WHC's Conduct in Filing This Motion**

On September 29, 2011, the Court held a Pre-Motion Conference in this case. During that hearing, both parties were asked whether they intended to file dispositive motions and, if so, to summarize the grounds for their anticipated motion(s) and the undisputed facts they believed entitled them to judgment as a matter of law. WHC indicated that it would seek summary judgment and would argue, in part, that Hancock's ADA claims should be dismissed because

Hancock was not terminated due to a disability; rather, WHC claimed that Hancock's employment was terminated in June 2008, after she failed to respond to WHC's requests for more information and was deemed to have abandoned her position. (Pre-Motion Tr. at 20:2-18). In response, Hancock stated that there was evidence that her employment was actually terminated on December 21, 2007, and not in June 2008. (*Id.* at 22:17-23:25). Based on Hancock's representations, the Court warned WHC that there appeared to be a dispute of fact surrounding Hancock's termination date, and that this factual dispute appeared to be material. (*Id.* at 25:4-26:12). As a result, the Court asked WHC to carefully consider whether there was a credible basis to seek summary judgment and to "look long and hard and think long and hard before [it] file[d] a motion on those grounds." (*Id.*).

WHC proceeded to file its motion on Hancock's ADA claims anyway. But as set forth above, the date of Hancock's termination is clearly in dispute, and that dispute is material to Hancock's ADA claims. In addition, it is also clearly disputed whether Mr. Russell had been told that Hancock's triage restriction was indefinite at the time she made the decision not to accommodate Hancock, as WHC argues. WHC also asserted that it was undisputed that Hancock provided Exhibit 19 to its motion—which ostensibly imposed Hancock's triage restriction "until further notice"—to WHC on December 20, 2007. (Def.'s Stmt. at ¶ 14). But WHC did not submit testimony from any witness to support this assertion, and it is actually contradicted by WHC's own witness, Ms. Cox, who testified that Exhibit 19 was given to her on December 28, 2007. This latter "fact" was, at best, disputed, but the more appropriate characterization is that the assertion was outright false.

In light of these plain disputes of facts—which are patently material to the resolution of Hancock's claims—WHC's motion as to these two claims was frivolous and clearly without

merit. Further, WHC also violated the Court's Order by attempting to rely on numerous factual assertions in its brief that were not listed its LCvR 7(h) statement of undisputed facts, (*see* Dkt. No. 19 at ¶ 3), including, but not limited to:

- "Associates are referred to work-life services when their restrictions can no longer be accommodated," (Def.'s Mem. at 7);

- "Ms. Hancock came in to apply for medical leave on December 28, 2007, was advised that additional information was needed from her position to determine whether Ms. Hancock's restrictions were permanent, and that Ms. Hancock advised them that her physician was either on vacation or holiday," (Def.'s Mem. at 7);

- "Neither Ms. Hancock nor her physician further advised Ms. Cox on this crucial matter," (Def.'s Mem. at 7); and

- "Plaintiff continued to receive both payments and correspondence from WHC until June 2008," (Def.'s Mem. at 14).

Therefore, as WHC was warned, the Court finds that sanctions may be appropriate, given that its motion for summary judgment as to Hancock's ADA claims appears to have been filed "in bad faith, vexatiously, wantonly, or for oppressive reasons." *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 48 (1991); *Shepard v. ABC*, 62 F.3d 1469, 1474-75 (D.C. Cir. 1995); *United States v. Wallace*, 964 F.2d 1214, 1218 (D.C. Cir. 1992) ("The *Chambers* Court explicitly recognized courts' inherent power to assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."). Moreover, given that WHC's submissions were filed in violation of the Court's Order, sanctions appear appropriate on these grounds as well. FED. R. CIV. P. 16(f), 37(b)(2)(A)(ii) through (vii).

WHC shall therefore SHOW CAUSE: (1) why the Court should not impose sanctions against WHC and in favor of Hancock, in the amount of two-thirds (2/3) of the attorneys' fees

Hancock incurred in preparing and filing an opposition to WHC's frivolous motion,[9] and (2) why each attorney who signed WHC's summary judgment submissions should not be reprimanded. By no later than December 14, 2012, Hancock shall prepare and file a report detailing the attorneys' fees incurred in preparing her opposition to WHC's motion for summary judgment. Thereafter, the parties shall meet and confer in an attempt to mutually resolve this issue. If the parties are unable to resolve the issue, then WHC shall file its response to this Order to Show Cause by no later than Wednesday January 2, 2013, and Hancock shall file any response to WHC's submission by no later than January 9, 2013. The parties shall thereafter appear for a hearing on Tuesday January 22, 2013, at 10:00 A.M. on the Court's Order to Show Cause and to set dates for a Pretrial Conference and for trial.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED in PART and DENIED in PART. An Order accompanies this Memorandum Opinion.

Date: December 7, 2012

Digitally signed by Judge Robert L. Wilkins
DN: cn=Judge Robert L. Wilkins, o=U.S. District Court, ou=Chambers of Honorable Robert L. Wilkins, email=RW@dc.uscourt.gov, c=US
Date: 2012.12.07 15:01:21 -05'00'

ROBERT L. WILKINS
United States District Judge

9 Insofar as the Court granted WHC's motion as to Hancock's IIED claim, the Court finds that a sanction for the full amount of fees would be inappropriate.